**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN GEHRINGER, et al.<br><br>            Plaintiffs,<br><br>v.<br><br>ATLANTIC DETROIT DIESEL ALLISON<br>LLC, et al.<br><br>            Defendants. | Civil Action No. 08-3917 (JLL) (JAD)<br><br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendants Atlantic Detroit Diesel Allison LLC ("ADDA") and Local 15C International Union of Operating Engineers ( "Local 15C") (collectively "Defendants")'s motions for summary judgment pursuant to Fed. R. Civ. P. 56. The Court decides this matter without oral argument pursuant to Fed. R. Civ. P. 78. Upon consideration of the Parties' submissions, the Court grants summary judgment in favor of Defendants.

## I.    BACKGROUND[1]

Plaintiffs bring this hybrid action against their former employer, ADDA, and their union, Local 15C, pursuant to Section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 185. Plaintiffs allege that ADDA breached the terms of its collective bargaining

---

[1] Throughout Plaintiffs' Response to Defendants' Joint Local Rule 56.1 Statement of Undisputed Material Facts, Plaintiffs admit that many of Defendants' separately numbered material facts "accurately reflect " the deposition testimony cited therein. *See, e.g.*, Pls.' Resp. 56.1 Stmt. ¶ 97, ECF No. 100 ("Admitted that this accurately reflects the deposition testimony cited."). This Court considers Defendants' recitation of the facts as undisputed by these admissions because they provide no citations to the record suggesting otherwise. L. Civ. R. 56.1.

agreement (the "CBA") with Local 15C when it terminated them and that Local 15C subsequently failed to fairly represent them. *See* Compl. ¶¶ 41-54, 63-68, ECF No. 23.

ADDA sells and services diesel engines for vehicles including buses. Def. Local 15C's Br. 1, ECF No. 81; *See* Pls' Opp. Br. 2, ECF No. 99. In 2007, the New York City Department of Education (the "DOE") awarded ADDA a contract to repair and service a large number of its buses (the "DOE Project") by September 1 of that year. Def. Local 15C's 56.1 Stmt. ¶ 23, ECF No. 82; Pls.' Resp. 56.1 Stmt. ¶ 23, ECF No. 100. Plaintiffs,[2] ten diesel mechanics and members of Local 15C, worked on the DOE Project. Def. Local 15C's 56.1 Stmt. ¶ 24; Pls.' Resp. 56.1 Stmt. ¶ 24.

While working on the DOE Project, each Plaintiff would typically report to one of two ADDA facilities in Lodi, New Jersey at the start of his shift—the Bus Service Center on 33 Gregg Street (the "BSC") or the facility on 180 Route 17 South (the "Route 17 Facility"). Def. Local 15C's 56.1 Stmt. ¶¶ 2, 33; Pls.' Resp. 56.1 Stmt. ¶¶ 2, 33. Each Plaintiff would then pick up any necessary equipment and travel in an ADDA van to a DOE facility in either Staten Island or the Bronx. *See* Def. Local 15C's 56.1 Stmt. ¶¶ 31, 33; Pls.' Resp. 56.1 Stmt. ¶¶ 31, 33. At the end of his shift, each Plaintiff would typically return to his assigned ADDA facility in the same van. Def. Local 15C's 56.1 Stmt. ¶ 38; Pls.' Resp. 56.1 Stmt. ¶ 38. Each van was equipped with both a GPS system and E-ZPass visible to Plaintiffs. Def. Local 15C's 56.1 Stmt. ¶ 37; Pls.' Resp. 56.1 Stmt. ¶ 37.

In the summer of 2007, the DOE expanded its contract with ADDA. Def. Local 15C's 56.1 Stmt. ¶ 44; Pls.' Resp. 56.1 Stmt. ¶ 44. The expanded contract required ADDA to service over one hundred additional buses, but did not provide ADDA with additional time to complete

---

[2] John Gehringer, Juan C. Ayala, Patrick Brown, Jean Daniel Chalmers, Scott M. Curry, Dennis Galloway, Timothy J. Kogit, Cliff Novins, Gary P. Schaffner, Jr., and Frantz St. Vil.

the DOE Project. Def. Local 15C's 56.1 Stmt. ¶ 44; Pls.' Resp. 56.1 Stmt. ¶ 44.  Thus, ADDA

had to complete the DOE Project by the same deadline, September 1, 2007. Def. Local 15C's

56.1 Stmt. ¶ 44; Pls.' Resp. 56.1 Stmt. ¶ 44.  Anthony Cirillo, the ADDA Branch Manager of the

BSC, was responsible for ensuring such completion. Def. Local 15C's 56.1 Stmt. ¶ 27; Pls.'

Resp. 56.1 Stmt. ¶ 27.

　　　　Faced with the challenge of completing the additional buses by the same deadline, Cirillo

met with the DOE Project's lead mechanics—John Gehringer, Frantz St. Vil., and James Van

Splinter—to discuss how they should proceed (the "Meeting"). Def. Local 15C's 56.1 Stmt. ¶¶

47-48, 57; Pls.' Resp. 56.1 Stmt. ¶¶ 47-48, 57; Pls.' 56.1 Stmt. ¶ 1, ECF No. 99-1; Def. Local

15C's Resp. 56.1 Stmt. ¶ 1, ECF No. 104-1.  The Parties agree that Cirillo "made it perfectly

clear" that "[i]ncomplete was not an option." Def. Local 15C's 56.1 Stmt. ¶ 49; Pls.' Resp. 56.1

Stmt. ¶ 49.  They also agree that Cirillo used words to the effect of:  "you guys got carte blanche,

do whatever it takes, as much overtime as the guys need, whatever you have to do, get the job

done, you have 'carte blanche.'" Def. Local 15C's 56.1 Stmt. ¶ 49; Pls.' Resp. 56.1 Stmt. ¶ 49.

However, the Parties dispute both what Cirillo meant by "carte blanche" and what else he said at

the Meeting.  Plaintiffs contend that Cirillo explicitly authorized an "incentive" payment scheme

whereby their payment would reflect having worked a set number of hours on each bus serviced

regardless of the hours spent doing so. Pls.' 56.1 Stmt. ¶¶ 4-6.  Conversely, Defendants maintain

that Cirillo never authorized such a scheme, and intended "carte blanche" to pertain to manpower

and overtime. Def. Local 15C's 56.1 Stmt. ¶ 50-51.

　　　　The Parties agree on the events that followed the Meeting.  Over the course of the next

several days, and during separate discussions, the lead mechanics told other mechanics that

Cirillo gave them "carte blanche" to complete the DOE Project. Def. Local 15C's 56.1 Stmt. ¶

56; Pls.' Resp. 56.1 Stmt. ¶ 56.  Many of the mechanics then began to regularly put hours on their time cards based on the number of buses that they completed instead of the hours that they actually worked.  Def. Local 15C's 56.1 Stmt. ¶ 58; Pls.' Resp. 56.1 Stmt. ¶ 58.  Some mechanics also allowed Van Splinter or another mechanic to complete their timecards for them. Def. Local 15C's 56.1 Stmt. ¶ 60; Pls.' Resp. 56.1 Stmt. ¶ 60.

Not all of the mechanics assigned to the DOE project subscribed to Plaintiffs' billing practices.  Def. Local 15C's 56.1 Stmt. ¶ 123; Pls.' Resp. 56.1 Stmt. ¶ 123.  Mechanics Olger Mora and Tom Joyce opted not to do so after talking with John Ference, a shop steward at Local 15C, at the start of one of their shifts.  Def. Local 15C's 56.1 Stmt. ¶ 125; Pls.' Resp. 56.1 Stmt. ¶ 125.  Ference told Mora and Joyce that "[w]e don't do deals and we get paid by the hour.  We go by the contract."  Def. Local 15C's 56.1 Stmt. ¶ 126; Pls.' Resp. 56.1 Stmt. ¶ 126.

Cirillo maintains that he first became aware of Plaintiffs' billing practices on August 31, 2007.  *See* Def. Local 15C's 56.1 Stmt. ¶¶ 62-71.  On that date, Cirillo became suspicious when he saw two ADDA vans parked outside the BSC four hours before the employees inside them were scheduled to return.  *See id.* at ¶ 62.  ADDA President John Farmer directed an investigation of the matter shortly thereafter.  *Id.* at ¶ 76; Pls.' Resp. 56.1 Stmt. at ¶ 76.  Cirillo gathered and reviewed the DOE Project employees' timecards, GPS records, and E-ZPass records.  Def. Local 15C's 56.1 Stmt. ¶ 79; Pls.' Resp. 56.1 Stmt. ¶ 79.  The timecard records, when compared with the GPS and E-ZPass records, revealed that Plaintiffs recorded time that they did not actually work.  Def. Local 15C's 56.1 Stmt. ¶ 86; Pls.' Resp. 56.1 Stmt. ¶ 86.

On September 7, 2007, Farmer concluded that Plaintiffs had falsified their timecards and decided to dismiss them.  Def. Local 15C's 56.1 Stmt. ¶ 91; Pls.' Resp. 56.1 Stmt. ¶ 91.  Before dismissing Plaintiffs, Farmer informed James Callahan, Local 15C's President and Business

4

Manager, that terminations were imminent. Def. Local 15C's 56.1 Stmt. ¶ 94; Pls.' Resp. 56.1
Stmt. ¶ 94; Pls.' 56.1 Stmt. ¶ 15; Def. Local 15C's Resp. 56.1 Stmt. ¶ 15.  Likewise, Timothy
Meade, ADDA's Senior Vice President for Sales and Services, contacted Robert Burns, Local
15C's Business Agent, a week before the terminations. Def. Local 15C's 56.1 Stmt. ¶ 98; Pls.'
Resp. 56.1 Stmt. ¶ 98; Pls.' 56.1 Stmt. ¶ 16; Def. Local 15C's Resp. 56.1 Stmt. ¶ 16.  Burns
asked Meade if there was anything that could be done and Meade responded "absolutely not."
Def. Local 15C's 56.1 Stmt. ¶ 98; Pls.' Resp. 56.1 Stmt. ¶ 98.  Burns also asked Shop Steward
Ference to appear at each termination meeting on Local 15C's behalf and to instruct Plaintiffs to
remain silent so as not to incriminate themselves. Def. Local 15C's 56.1 Stmt. ¶ 97; Pls.' Resp.
56.1 Stmt. ¶ 97.

On September 10 and 11, 2007, ADDA met with Plaintiffs and four other Local 15C
members who are not participants in this action to inform them of their terminations. Def. Local
15C's 56.1 Stmt. ¶ 101; Pls.' Resp. 56.1 Stmt. ¶ 101.  A shop steward or Local 15C
representative was present at each meeting. Def. Local 15C's 56.1 Stmt. ¶ 102; Pls.' Resp. 56.1
Stmt. ¶ 102.  Megan Hollberg, ADDA's Vice President of Human Resources, attended each
meeting and took notes. Def. Local 15C's 56.1 Stmt. ¶¶ 103-04; Pls.' Resp. 56.1 Stmt. ¶¶ 103-
04.  Local 15C later relied on Hollberg's notes when conducting its investigation. Def. Local
15C's 56.1 Stmt. ¶ 130; Pls.' Resp. 56.1 Stmt. ¶ 130.

The day after Plaintiffs' terminations, Callahan called Farmer. Def. Local 15C's 56.1
Stmt. ¶ 113; Pls.' Resp. 56.1 Stmt. ¶ 113.  During their conversation, Callahan requested ADDA
documents from Farmer and asked him whether anything could be done to return Plaintiffs to
work. Def. Local 15C's 56.1 Stmt. ¶¶ 113-14; Pls.' Resp. 56.1 Stmt. ¶¶ 113-14.  Shortly

thereafter, Callahan and Burns met with Farmer to again discuss whether anything could be done to return Plaintiffs to work. Def. Local 15C's 56.1 Stmt. ¶ 115; Pls.' Resp. 56.1 Stmt. ¶ 115.

Burns informed Matthew McGuire, Local 15C's Labor Counsel, of the situation approximately one week after the terminations. Def. Local 15C's 56.1 Stmt. at ¶ 116; Pls.' Resp. 56.1 Stmt. at ¶ 116. McGuire advised Burns to request supporting documentation and a written explanation as to why ADDA terminated Plaintiffs from ADDA. Def. Local 15C's 56.1 Stmt. ¶¶ 117, 119; Pls.' Resp. 56.1 Stmt. ¶ 117, 119. Burns did so. Def. Local 15C's 56.1 Stmt. ¶¶ 118, 120; Pls.' Resp. 56.1 Stmt. ¶¶ 118, 120. In response, Farmer sent Local 15C a letter stating ADDA's rationale for dismissing Plaintiffs. Def. Local 15C's 56.1 Stmt. ¶ 120; Pls.' Resp. 56.1 Stmt. ¶ 120. The letter explained that ADDA terminated Plaintiffs for engaging in "serious misconduct" including: (1) "Time card/Time record violations;" (2) "Falsification of company records;" (3) "Willful violation of established policy or rule;" (4) "Breach of trust or dishonesty;" and (5) "Theft of time." Def. Local 15C's 56.1 Stmt. ¶ 120; Pls.' Resp. 56.1 Stmt. ¶ 120.

After receiving Farmer's letter, Callahan instructed McGuire to conduct a formal investigation of the terminations. Def. Local 15C's 56.1 Stmt. ¶ 121; Pls.' Resp. 56.1 Stmt. ¶ 121. McGuire proceeded to speak with Shop Steward Ference on October 26 and December 5, 2007. Def. Local 15C's 56.1 Stmt. ¶ 124; Pls.' Resp. 56.1 Stmt. ¶ 124. Ference told McGuire about Mora and Joyce's decisions not to participate in Plaintiffs' billing practices. Def. Local 15C's 56.1 Stmt. ¶¶ 125-26; Pls.' Resp. 56.1 Stmt. ¶¶ 125-26. Ference also told McGuire that Plaintiffs Kogit and Curry angrily denied the existence of any secretive deal when he confronted them. Def. Local 15C's 56.1 Stmt. ¶ 127; Pls.' Resp. 56.1 Stmt. ¶ 127. McGuire interviewed Joyce on October 30, 2007. Def. Local 15C's 56.1 Stmt. ¶ 128; Pls.' Resp. 56.1 Stmt. ¶ 128. Joyce stated that on August 24, 2007, Plaintiffs Kogit and Curry told him that he would be paid

for a certain number of hours so long as he completed three buses per night. Def. Local 15C's 56.1 Stmt. ¶ 129; Pls.' Resp. 56.1 Stmt. ¶ 129.

On November 16, 2007, Hollberg provided Local 15C with evidence that ADDA believed confirmed Plaintiffs' alleged wrongdoing. Def. Local 15C's 56.1 Stmt. ¶ 130; Pls.' Resp. 56.1 Stmt. ¶ 130. Specifically, Hollberg provided: (1) her notes from the termination meetings; (2) spreadsheets comparing Plaintiffs' timecards, GPS records, and E-ZPass records; and (3) an October 26, 2007 memorandum from Cirillo concerning the events of August 31, 2007, and the subsequent investigation. Def. Local 15C's 56.1 Stmt. ¶ 130; Pls.' Resp. 56.1 Stmt. ¶ 130. McGuire reviewed these documents. Def. Local 15C's 56.1 Stmt. ¶¶ 147-48, 152; Pls.' Resp. 56.1 Stmt. at ¶¶ 147-48, 152. Notably, the spreadsheets showed discrepancies in four of Plaintiffs' timecards before Cirillo allegedly authorized Plaintiffs' billing practices at the Meeting. Def. Local 15C's 56.1 Stmt. ¶ 151; Pls.' Resp. 56.1 Stmt. ¶ 151. In other words, four Plaintiffs billed time for hours that they did not actually work before the Meeting. *See* Def. Local 15C's 56.1 Stmt. ¶ 151; Pls.' Resp. 56.1 Stmt. ¶ 151.

McGuire also met with Plaintiffs Gehringer and Kogit and their attorney, Leonard Kaufman, on December 4, 2007. Def. Local 15C's 56.1 Stmt. ¶¶ 138-39; Pls.' Resp. 56.1 Stmt. ¶¶ 138-39. The purpose of the meeting was for McGuire to speak to Plaintiffs directly about their claim that they had meritorious grievances. Def. Local 15C's 56.1 Stmt. ¶ 137; Pls.' Resp. 56.1 Stmt. ¶ 137. At the meeting, Gehringer told McGuire that Cirillo gave Plaintiffs "carte blanche," and instructed them to "bill eight hours per bus." Def. Local 15C's 56.1 Stmt. ¶ 140; Pls.' Resp. 56.1 Stmt. ¶ 140. When McGuire asked Gehringer why he did not ask Local 15C about the deal with ADDA, he responded that "this stuff goes on all the time." Def. Local 15C's 56.1 Stmt. ¶ 142; Pls.' Resp. 56.1 Stmt. ¶ 142. In addition, Kogit denied speaking with Mora,

7

Joyce, and/or Ference at the meeting. Def. Local 15C's 56.1 Stmt. ¶ 144; Pls.' Resp. 56.1 Stmt.
¶ 144. Gehringer and Kogit have since asserted that they did not think that this meeting was fair
because McGuire's questions and demeanor suggested that it was aimed at preparing a defense
for a possible lawsuit rather than assisting them. *See* Gehringer's Aff. ¶¶ 5-10, ECF No. ;
Kogit's Aff. ¶¶ 3-8, ECF No. 99-15.

On December 23, 2007, McGuire recommended that Local 15C not grieve the
terminations. Def. Local 15C's 56.1 Stmt. ¶ 165; Pls.' Resp. 56.1 Stmt. ¶ 165. Four
considerations guided McGuire's recommendation. First, McGuire believed that an arbitrator
would have been unlikely to find that Plaintiffs' purported unilateral oral deal with Cirello
justified their conduct. Def. Local 15C's 56.1 Stmt. ¶ 158; Pls.' Resp. 56.1 Stmt. ¶ 158. Second,
McGuire noted that in his experience arbitrators did not look lightly upon timecard falsification.
Def. Local 15C's 56.1 Stmt. ¶ 156; Pls.' Resp. 56.1 Stmt. ¶ 156. Third, McGuire believed that
there were numerous credibility issues that stood in the way of successfully arbitrating Plaintiffs'
claims. Def. Local 15C's 56.1 Stmt. ¶¶ 160-63; Pls.' Resp. 56.1 Stmt. ¶¶ 160-63. And, fourth,
McGuire did not know what most Plaintiffs would say at arbitration because when he tried to
speak with them, Plaintiffs' counsel only produced Gehringer and Kogit. Def. Local 15C's 56.1
Stmt. ¶ 164. As to this fourth consideration, Plaintiffs contend that only Gehringer and Kogit
spoke with McGuire because the investigation was a "sham." Pls.' Resp. 56.1 Stmt. ¶ 164. By
way of letter dated January 8, 2008, McGuire advised Kaufmann that Local 15C had decided not
to initiate a grievance proceeding on behalf of Plaintiffs. Def. Local 15C's 56.1 Stmt. ¶ 167;
Pls.' Resp. 56.1 Stmt. ¶ 167.

Plaintiffs filed this action against Defendants in the Superior Court of New Jersey,
Bergen County, on July 3, 2008. State Ct. Compl., ECF No. 1-1. Plaintiffs' Complaint asserts

the following claims:  (1) ADDA breached the CBA; (2) Local 15C breached the CBA and its duty of fair representation; and (3) tortious interference with respect to economic advantage against ADDA.[3]  Compl. ¶¶ 41-68.  Defendants subsequently removed this action to this Court on August 5, 2008.  Notice of Removal, ECF No. 1.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 185.  Defendants now motion for summary judgment.  ADDA's Mot. for Summ. J., ECF No. 75, Local 15C's Mot. for Summ. J., ECF No. 80.

## II.    LEGAL STANDARD

A court shall grant summary judgment under Rule 56 of the Federal Rules of Civil Procedure if the materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On a summary judgment motion, the moving party must first show that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party to present evidence that a genuine dispute of material fact compels a trial. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (citations omitted).  To do so, the nonmoving party must offer specific facts that establish such an issue, and may not simply rely on unsupported assertions, bare allegations, or speculation. *Id.* (citation omitted).  The Court must consider all facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party. *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## III.    DISCUSSION

Plaintiffs bring this hybrid suit against ADDA and Local 15C pursuant to Section 301 of the LMRA.  Plaintiffs allege that:  (1) ADDA breached the terms of its CBA with Local 15C

---

[3] The Parties stipulated and agreed to dismiss all claims for tortious interference by each Plaintiff.  Stipulation of Dismissal for Tortious Interference Claims Only, ECF No. 73.

9

when it terminated them; and (2) Local 15C subsequently breached its duty of fair representation. *See* Compl. ¶¶ 41-54, 63-68. "A breach of the duty of fair representation is a 'necessary condition precedent' to the . . . claim [against the employer] in hybrid suits where the employee sues both the employer and union . . . ." *Albright v. Virtue*, 273 F.3d 564, 576 (3d Cir. 2001). Thus, this Court first addresses Plaintiffs' breach of the duty of fair representation claim.

A.     Whether Local 15C Breached its Duty of Fair Representation to Plaintiffs

Local 15C contends that summary judgment in its favor is proper because there is no genuine dispute that it complied with its duty to fairly represent Plaintiffs. *See* Def. Local 15C's Br. 25. "Because a union is authorized to act as the exclusive bargaining agent for its members, it has a duty to provide fair representation in the negotiation, administration, and enforcement of the [CBA]." *Findley v. Jones Motor Freight*, 639 F.2d 953, 957 (3d Cir. 1981). A union does not breach this duty simply by refusing to arbitrate a claim, even if that claim was meritorious. *Id.* at 958 (citing *Vaca v. Sipes*, 386 U.S. 171, 192-93, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967)). Likewise, "proof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation." *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970). Rather, "[p]roof of arbitrary or bad faith union conduct in deciding not to proceed with the grievance is necessary to establish" such a breach. *Id.* (citing *Vaca*, 386 U.S. at 194-95). Here, Local 15C contends that there is no genuine dispute that its conduct was neither in bad faith nor arbitrary and that, as a result, summary judgment is proper. Def. Local 15C's Br. 25-36.

1.     Whether Local 15C Acted in Bad Faith in Refusing to Arbitrate Plaintiffs' Claims

Local 15C contends that it did not act in bad faith in refusing to arbitrate Plaintiffs' claims. *Id.* at 26-28. "What constitutes 'bad faith' in a given case, of course, depends upon the

circumstances." *Findley*, 639 F.2d at 959.  That being said, "[m]ore than mere unsupported allegations are required to justify a finding of bad faith on a union's part." *Bellesfield v. RCA Commc'ns, Inc.*, 675 F. Supp. 952, 956 (D.N.J. 1987).  Some courts have even insisted that "bad faith requires a plaintiff to make two showings:  (1) the union and its representatives harbored animosity towards the employee; and (2) that animosity manifested itself as a material factor in the union's handling of the employee's grievance." *Morgan v. Commc'ns Workers of Am., AFL-CIO, Dist. 1*, No. 08-249, 2009 WL 749546, *8 (D.N.J. Mar. 17, 2009) (citing *Maskin v. United Steel Workers of Am.*, 136 F. Supp. 2d 375, 382 (W. D. Pa. 2000)).  Here, Plaintiffs assert that three shortcomings demonstrate Local 15C's bad faith in handling their arbitration request:  (1) Local 15C's alleged failure to act on Plaintiffs' behalf before ADDA terminated them; (2) Local 15C's alleged failure to act on Plaintiffs' behalf before they engaged independent counsel; and (3) the alleged overall sham nature of Local 15C's investigation.  *See* Pls.' Opp. Br. 14-15.  The Court addresses whether these three alleged shortcomings present a genuine dispute of material fact that compels a trial below.  In doing so, this Court is mindful that a union has an "obligation . . . *not* to assert or press grievances which it believes in good faith do not warrant such action." *Bazarte*, 429 F.2d at 872 (emphasis added).

First, Plaintiffs generally argue that Local 15C's failure to act on their behalf before ADDA terminated them demonstrates bad faith.  Specifically, Plaintiffs point out that despite Callahan and Burns' knowledge that Plaintiffs' terminations were imminent, they failed to act on Plaintiffs' behalf beforehand.  Pls.' Opp. Br. 14.  Plaintiffs also point to Local 15C's failure to obtain their side of the story before ADDA terminated them.  *Id.*  Plaintiffs' argument, however, ignores actions Burns took on Plaintiffs' behalf prior to their terminations.

Burns asked ADDA Vice President Meade if there was anything that could be done prior to the terminations, and Meade responded "absolutely not." Def. Local 15C's 56.1 Stmt. ¶ 98; Pls.' Resp. 56.1 Stmt. ¶ 98. Burns also asked Shop Steward Ference to appear at each termination meeting on Local 15C's behalf and to instruct Plaintiffs to remain silent so as not to incriminate themselves. Def. Local 15C's 56.1 Stmt. ¶ 97; Pls.' Resp. 56.1 Stmt. ¶ 97. Plaintiffs contend that Burns' actions suggest that he "blindly accepted ADDA's version of events" and rise to the level of bad faith. *See* Pls.' Opp. Br. 14. Again, "what constitutes 'bad faith' . . . depends upon the circumstances." *Findley*, 639 F.2d at 959. Given the circumstances and evidence in the record, no reasonable juror could conclude that Burns' action on behalf of Local 15C before Plaintiffs' terminations rose to the level of bad faith. Plaintiffs fail to provide other viable options that were available to Burns and Callahan aside from those pursued by Burns at the time of their terminations. Moreover, the Third Circuit has emphasized the importance of showing prejudice to an employee's interests when union inactivity allegedly breaches the duty of fair representation. *Bazarte*, 429 F.2d at 872 (finding that union's failure to keep employee informed was not a breach of duty "especially since there is not showing that this prejudiced him in any way"). Here, Local 15C's decision to delay action did not prejudice Plaintiffs. Regardless of whether Local 15C challenged Plaintiffs' terminations before their occurrence, Article XI of Local 15C's CBA with ADDA afforded Local 15C a means of challenging Plaintiffs' terminations after their occurrence. *See* Def. Local 15C's 56.1 Stmt. ¶ 15; Pls.' Resp. 56.1 Stmt. ¶ 15. Lastly, even if Local 15C's actions before Plaintiffs' terminations evinced "poor judgment," this would still "not [be] enough to support a claim of unfair representation." *Bazarte*, 429 F.2d at 872.

Second, Plaintiffs argue that Local 15C's failure to act on their behalf before they engaged independent counsel demonstrates bad faith. Pls.' Opp. Br. 14. Plaintiffs' argument is unfounded. Evidence in the record shows that Plaintiffs' counsel advised Local 15C of his representation of Plaintiffs on October 4, 2011. Pls.' 56.1 Stmt. ¶ 19; Def. ADDA's Resp. 56.1 Stmt. ¶ 19. There is also evidence showing that before that date, Local 15C engaged in the following acts on Plaintiffs' behalf. As noted above, Burns asked Meade if there was anything that could be done prior to Plaintiffs' terminations, and asked Ference to both appear at each termination meeting and instruct Plaintiffs to remain silent. Def. Local 15C's 56.1 Stmt. ¶¶ 97-98; Pls.' Resp. 56.1 Stmt. ¶¶ 97-98. A shop steward or Local 15C representative was in fact present at each termination meeting. Def. Local 15C's 56.1 Stmt. ¶ 102; Pls.' Resp. 56.1 Stmt. ¶ 102. Moreover, Callahan called Farmer the day after Plaintiffs' terminations. Def. Local 15C's 56.1 Stmt. ¶ 113; Pls.' Resp. 56.1 Stmt. ¶ 113. During their conversation, Callahan requested ADDA documents from Farmer and asked him whether anything could be done to return Plaintiffs to work. Def. Local 15C's 56.1 Stmt. ¶¶ 113-14; Pls.' Resp. 56.1 Stmt. ¶¶ 113-14. Shortly after this telephone call, Callahan and Burns met with Farmer to again discuss whether anything could be done to return Plaintiffs to work. Def. Local 15C's 56.1 Stmt. ¶ 115; Pls.' Resp. 56.1 Stmt. ¶ 115. Lastly, Burns called Local 15C's counsel, McGuire, approximately one week after the terminations to inform him of the situation. Def. Local 15C's 56.1 Stmt. ¶ 116; Pls.' Resp. 56.1 Stmt. ¶ 116.

Third, Plaintiffs argue that "[t]he sham nature of the investigation, evidenced by the conduct of the Union representatives at the December 2007 meeting with Gehringer and Kogit" demonstrates bad faith. Pls.' Opp. Br.15. Gehringer and Kogit provided affidavits wherein they both stated, in essence, that they did not think that the meeting was fair. *See* Gehringer's Aff. ¶

13

7; Kogit's Aff. ¶ 7. They noted that both the questions and demeanor of Local 15C's representatives gave them the impression that the meeting was aimed at preparing a defense for a possible lawsuit rather than assisting them. *See* Gehringer's Aff. ¶¶ 5-8; Kogit's Aff. ¶¶ 4-6. They did not, however, provide any specific questions that should have been asked or mention anything specific about the representatives' demeanor that would suggest the existence of bad faith. "In order to satisfy the standard for summary judgment 'the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is 'essentially conclusory' and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden.'" *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985)). Here, Gehringer and Kogit's affidavits failed to set forth specific facts behind their impressions and are, thus, insufficient. As "[m]ore than mere unsupported allegations are required to justify a finding of bad faith on a union's part," Plaintiffs have failed to raise a genuine dispute of material fact. *Bellesfield*, 675 F. Supp. at 956.

### 2. Whether Local 15C Acted Arbitrarily in Refusing to Arbitrate Plaintiffs' Claims

Local 15C contends that it did not act arbitrarily in refusing to arbitrate Plaintiffs' claims. Def. Local 15C's Br. 28-36. In opposition, Plaintiffs generally assert that Local 15C's actions could fairly be characterized as arbitrary. Pls.' Opp. Br. `5. "[A] unions actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness[]' . . . as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67, 111 S. Ct. 1127, 113 L. Ed. 2d 51 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S. Ct. 681, 97 L. Ed. 1048 (1953)). In other words, "[a] union's conduct can be classified as arbitrary only when it is irrational, when it is

without a rational basis or explanation." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 46, 119 S. Ct. 292, 142 L. Ed. 2d 242 (1998) (citation omitted).

Here, Local 15C provided a rational basis for its decision. Local 15C based its decision, in part, on the fact that Plaintiffs' timecard records received from ADDA, when compared with the GPS and E-ZPass records, revealed that they recorded time that they did not actually work. Def. Local 15C's 56.1 Stmt. ¶¶ 86, 130; Pls.' Resp. 56.1 Stmt. ¶¶ 86, 130. Local 15C further based its decision on the refusal of mechanics Mora and Joyce to subscribe to Plaintiffs' billing practices after talking with Ference. Def. local 15C's 56.1 Stmt. ¶¶ 123-26; Pls.' Resp. 56.1 Stmt. ¶¶ 123-26. Thus, no reasonable jury could find that Local 15C's decision not to arbitrate Plaintiffs' claims was without rational basis, or, in other words, arbitrary. *See, e.g., Thrash v. PepsiCo*, 11-410, 2012 WL 3779351, *9-10 (M. D. Pa. Aug. 7, 2012), *adopting magistrate judge's report and recommendation*, 2012 WL 3779350 (M. D. Pa. Aug. 30, 2012) (concluding that no reasonable jury could find union's decision not to arbitrate plaintiff's termination arbitrary, discriminatory, or in bad faith where union officials based that decision on documents requested and received from employer).

What's more, even if Cirillo authorized Plaintiffs' billing practices, a successful outcome for Plaintiffs remained doubtful for at least two reasons. First, the evidence gathered showed discrepancies in four of Plaintiffs' timecards *before* Cirillo allegedly authorized Plaintiffs' billing practices. Def. Local 15C's Stmt. ¶ 151; Pls.' Resp. 56.1 Stmt. ¶ 151. And, second, Local 15C's CBA with ADDA both trumped and conflicted with Plaintiffs' unilateral deal with Cirillo. The CBA trumped Plaintiffs' unilateral deal with Cirillo as it identified Local 15C as the "sole representative for unit members." Def. Local 15C's Stmt. ¶ 6; Pls.' Resp. 56.1 Stmt. ¶ 6. The CBA conflicted with Plaintiffs' unilateral deal with Cirillo because it did not specifically address

"piecework" payment and otherwise provided for payment for "work performed" or "hours worked." Def. Local 15C's Stmt. ¶¶ 9-11 ; Pls.' Resp. 56.1 Stmt. ¶¶ 9-11. To the extent that Plaintiffs attempt to refute this interpretation, "a union does not breach its duty of fair representation by rejecting an employee's interpretation of the collective bargaining agreement unless the union's interpretation is itself arbitrary or unreasonable." *Bache v. Am. Tel. & Tel.*, 840 F.2d 283, 291 (5th Cir. 1988) (quoted favorably in *Acosta v. HOVENSA LLC*, 2013 WL 3481714, *2 (3d Cir. July 9, 2013). Plaintiffs have failed to come forward with any evidence or binding legal authority suggesting—much less demonstrating—that Local 15C's interpretation of the CBA is arbitrary or unreasonable. Since Plaintiffs have failed to raise a genuine dispute of material fact, summary judgment in favor of Local 15C is proper as to Plaintiffs' breach of the duty of fair representation claim.

B.     Whether ADDA Breached its CBA with Local 15C

Again, "[a] breach of the duty of fair representation is a 'necessary condition precedent' to the  . . . [breach of the CBA claim against the employer] in hybrid suits where the employee sues both the employer and union . . . ." *Albright*, 273 F.3d at 576. Here, this condition precedent to Plaintiffs' breach of the CBA claim against ADDA is not met as this Court above held that Local 15C did not breach the duty of fair representation. Accordingly, the Court grants ADDA's motion for summary judgment as to Plaintiffs' breach of the CBA claim.[4] *See, e.g., Fajardo v. Foodtown Supermarkets*, 702 F. Supp. 502, 508 (D.N.J. 1988) (granting employer's motion for summary judgment on breach of CBA claim where plaintiff failed to proffer sufficient evidence from which a jury could conclude that the union breached its duty of fair representation).

---

[4] To the extent that Plaintiffs now attempt to assert an equitable estoppel claim against ADDA, this claim was not set forth in the operative complaint in this matter and is, therefore, not properly before this Court.

16

## IV.   CONCLUSION

For the reasons discussed herein, Defendants' motions for summary judgment are GRANTED in their entirety.

An appropriate Order accompanies this Opinion.

DATED:  3 of October, 2013.

JOSE L. LINARES
U.S. DISTRICT JUDGE

17